UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
EVANSVILLE DIVISION

| FEDERAL DEPOSIT INSURANCE CORPORATION as Receiver for Integra Bank, N.A., | ) ) ) ) | |
|---|---|---|
| Plaintiffs, | ) ) | |
| vs. | ) ) | 3:11-cv-00019-RLY-WGH |
| FIDELITY AND DEPOSIT COMPANY OF MARYLAND, | ) ) ) | |
| Defendant. | ) | |

**ENTRY ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff, Federal Deposit Insurance Corporation, as receiver for Integra Bank, N.A. ("FDIC"), seeks to recover on a financial institution bond issued to Integra by Defendant, Fidelity and Deposit Company of Maryland ("F&D"). Integra purchased the financial institution bond from F&D with a coverage period from July 1, 2007 to July 1, 2010. The policy covered those losses discovered during that time period regardless of when the loss occurred. F&D moves for summary judgment, alleging that the claim is time-barred and that the FDIC will not be able to meet its burden to prove coverage under Insuring Agreements A and E. The FDIC responded in opposition. For the reasons set forth below, F&D's motion for summary judgment is **DENIED.**

**I.** **Background**

1

This case arises out of the bank fraud and Ponzi scheme committed by Louis Pearlman ("Pearlman"). Throughout the scheme, Pearlman and his related entities obtained several loans from Integra, which totaled approximately $29 million. (Supplemental Complaint ¶ 39). Pearlman allegedly collaborated with Stuart Harrington ("Harrington"), Executive Vice President of Commercial Lending at Integra, to obtain these loans. Pearlman submitted false financial reports and documentation during the loan process to Harrington, who allegedly knew the documents were false but nevertheless secured the loans for Pearlman. When Pearlman and his related entities defaulted on the loans, they left Integra with losses of nearly $23 million. (*Id.* at ¶¶ 36, 41).

As a result of the defaults, on December 28, 2006, Integra filed suit against Pearlman and Trans Continental Airlines ("TCA"). In that complaint, Integra stated that its "recent dealings with Pearlman and his first company, TCA, would indicate that this outward mask conceals the fundamental economic instability more common to a Ponzi scheme." (Integra's Amended Complaint, Defendant's Exhibit 34 ¶ 6). Just a month later, on January 24, 2007, Integra filed a motion for a temporary restraining order alleging that the financial statements provided by TCA and Pearlman constituted a fraud on Integra and that Pearlman pledged the same stock that was pledged to Integra to other financial institutions. (Integra's Motion for Temporary Restraining Order, Defendant's Exhibit 73 p. 2, 8-9).

Pearlman was indicted on June 27, 2007. The indictment alleges in pertinent part that Pearlman:

> would falsely represent that an individual by the name of Harry Milner was an officer of Trans Con Airlines who had signed documents for the company, including the 2003 and 2004 federal corporate tax returns of Trans Con Airlines, corporate resolutions authorizing actions to be taken by Trans Con Airlines in connection with the loans and lines of credit from FDIC-insured financial institutions, and a November 15, 2006 letter to Integra Bank, when in truth and in fact, as defendant [Pearlman] then and there well knew, Harry Milner was deceased at the time that the documents described in this paragraph were allegedly signed by him.

(Pearlman Indictment, Defendant's Exhibit 13 ¶ 14, pg. 4-5). Integra's Chief Financial Officer learned of these forgeries by September 2007 and knew that Harry Milner was not associated with TCA.

On March 4, 2008, Integra received a copy of Pearlman's plea agreement. On March 18, 2008, Integra's outside counsel found the stock certificate pledged as collateral to Integra bank. The certificate purported to be signed by Harry Milner. On April 30, 2008, Integra submitted a notice of loss to F&D concerning coverage under Insuring Agreement E. In that notice of loss, Integra reserved the right to seek coverage under Insuring Agreement A. On August 6, 2008, Integra submitted a proof of loss pertaining to that claim. On November 20, 2008, F&D denied coverage under Insuring Agreements A and E finding: (1) the certificate was not in Integra's possession at the time they issued the loan and (2) Harrington was not an employee at the time of the loan giving rise to Integra's losses.

Rather than initiating a lawsuit, Integra and F&D entered into a tolling agreement on February 18, 2010, in which the time period to file a lawsuit was tolled, unless it had previously expired. On June 29, 2010, Integra filed a notice of loss under Insuring Agreement A followed by a supplemental proof of loss on December 2, 2010. (Filing

3

No. 154-3 ("Supplemental Proof of Loss")).  F&D again denied coverage.  As a result, at the termination of the tolling agreement in February 2011, Integra filed suit alleging breach of contract and seeking a declaratory judgment that it is entitled to coverage under the policy.  Near the end of July 2011, Integra failed and the FDIC became receiver.  After a tedious discovery filled with several disputes, the case has now progressed to the summary judgment stage.

## II. Standard

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  Summary judgment is appropriate if the record "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed R. Civ. P. 56(a).  A genuine issue of material fact exists if there is sufficient evidence for a reasonable jury to return a verdict in favor of the non-moving party on the particular issue.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## III. Discussion

F&D moves for summary judgment on the following grounds: (1) the FDIC's claim is time barred and (2) the FDIC cannot establish coverage under either Insuring Agreement A or Insuring Agreement E.  The FDIC responds that the claims are not time-barred and that there are issues of fact concerning coverage that preclude granting summary judgment.

### A. Is the FDIC's claim time-barred?

4

F&D first asserts that it is entitled to summary judgment because the FDIC's claims are time-barred under the terms of the Bond. In pertinent part, the Bond provides that "Legal Proceedings for the recovery of any loss hereunder shall not be brought . . . after the expiration of 24 months from the discovery of such loss." (Bond at § 5(d)). "Discovery occurs when a titled officer or risk manager of the Insured first becomes aware of facts which would cause a reasonable person to assume a loss of a type covered by this bond has been or will be incurred, regardless of when the act or acts causing or contributing to such loss occurred, even though the exact amount or details of loss may not then be known." (Bond, Conditions and Limitations, § 3). In response, the FDIC argues that the two-year provision is unenforceable in Indiana, and in the alternative, that it discovered its losses within the 24-month restriction. The court will consider each in turn.

### i. Is the two year contractual provision enforceable?

The FDIC first argues that Indiana law invalidates the 24-month restriction contained in Section 5(d) of the Bond. In support, the FDIC relies on *Indiana Reg'l Council of Carpenters Pension Trust Fund v. Fidelity & Deposit Co. of Maryland*, No. 2:06-cv-32 PS, 2007 WL 683795 (N.D. Ind. Mar. 2, 2007); *Indiana v. Lidster*, 467 N.E.2d 47, 49 (Ind. Ct. App. 1984); and *Hack v. American Surety Co.*, 96 F.2d 939, 944 (7th Cir. 1938). In *Indiana Regional*, the Northern District of Indiana declared the identical two-year provision invalid under Indiana law, because it conflicted with the general statute of limitations of ten years for breach of contract actions. *Id.* The Northern District relied on *Lindster*, an Indiana appellate court decision, which found

provisions shortening the applicable statute of limitations to be void. *See id.* at *5 (citing *Lidster*, 467 N.E.2d at 49). Additionally, the Northern District stressed that they could not distinguish *Hack v. American Surety Co.*, and thus was obligated to follow it. *Hack* held that a limitations period in an insurance bond was invalid because it contradicted a statute of limitations applicable to foreign corporations. *Hack* did not answer the question of whether the ten-year statute of limitations period should apply and rather suggested such a decision would eventually need to be made by the Supreme Court of Indiana. *Id.* at 944-45. Unfortunately this has not happened, and the district courts have been left to decide this important issue.

This court has previously addressed the issue in *National City Mortgage Co v. D & D Mortgage Solutions, Inc.*, No. 1:08-cv-657-RLY-TAB, 2008 WL 4545299 (S.D. Ind. Oct. 9, 2008). In that case, the court found that in an action on the bond itself, when there is no conflict between the law requiring the bond and the limitation period in the bond, then the bond controls. *Id.* at * 2.

The court stands by its prior decision. As Defendant argues, all the cases relied upon in *Indiana Regional* contain specific statute of limitations. *See e.g., Lidster*, 467 N.E.2d at 50 n.4 (invalidating a suit limitation provision in a public bond because it contradicted Indiana's specific statute of limitations for actions against a "public officer, or against such officer and his sureties on a public bond."); *see e.g., Hack*, 96 F.2d at 944-45. Although the Northern District could not distinguish *Hack*, this court finds that it is distinguishable. *Hack* relied on Indiana Code Annotated § 39-1713 (1933) to invalidate the suit limitation provision. Indiana Code § 39-1713 applied only to foreign

6

companies and specifically prohibited foreign insurance companies from enforcing a provision that limited the period to file suit to less than three years. Thus, it was a specific statute of limitations and is distinguishable from the facts before the court today.

Here, the FDIC asks the court to expand the reasoning to include general statute of limitations, specifically the ten-year provision for breach of contract. The court does not believe that precedent demands such an expansion and therefore, declines to expand upon *Lindster* and *Hack*. Therefore, the court finds the two-year suit limitation period contained in the bond is enforceable. Now, the court must determine whether there is an issue of material fact regarding when the losses were discovered.

### ii. Discovery of Losses

F&D asserts that Integra discovered the losses in 2007. The FDIC responds that Integra lacked the key facts necessary to discover its claims before February 18, 2008. Additionally, the parties dispute whether discovering one type of claim constitutes discovery for other types of claims. The court will first discuss that issue before proceeding to the actual timing of discovery.

Under the bond, discovery occurs when the "Insured first becomes aware of facts which would cause a reasonable person to assume a loss of a type covered by this bond has been or will be incurred." F&D stresses the word "a" in arguing that knowledge of *any* loss of *any* type covered by the bond constitutes discovery. To support its position, F&D relies on *FDIC v. The Cincinnati Insurance Cos., Inc.*, 981 F. Supp. 2d 1324 (N.D. Ga. 2013). *Cincinnati*, however, only involved one theory of coverage and thus is inapplicable. F&D stresses that the court in that case noted a dispute concerning whether

7

an attorney acted dishonestly. Although the court did note this, the court only considered coverage under Insuring Agreement E. *Id.* at 1334 (noting that "only Insuring Agreement E is at issue"). The role of the attorney was relevant to the exclusion of coverage under Insuring Agreement E. Thus, the *Cincinnati* case does not address the issue of when discovery occurs under two parts of the Bond.

With neither party citing a case directly on point, the court must evaluate this claim using its common sense. In doing so, the court finds that F&D's reading is too broad. Common sense dictates that each separate loss is discovered at a distinct time; if F&D's interpretation prevailed, an initial loss under one provision of the bond, no matter the value, may time-bar any subsequent losses that could not have been reasonably discovered before. This defeats the purpose of the coverage.

Here, the losses under Insuring Agreement Section A and Section E are distinct. They occurred at different times, involve different loans, and different amounts. Thus, the court finds that each loss may have been discovered at a distinct time.

Now the court turns to the issue of when each claim was discovered by Integra. As the Third Circuit stated, "this discovery standard is comprised of a subjective and objective component: the trier of fact must identify what facts and information the insured actually knew during the relevant time period, and it must determine, based on those facts, the conclusions that a reasonable person could draw from them." *Resolution Trust Corp. v. Fid. & Deposit Co. of Maryland*, 205 F.3d 615, 630 (3d Cir. 2000). Nevertheless, the "discovery threshold is low and the insured need not know the exact amount or details of the loss." *Id.* at 631.

8

1. **Section E**

Section E of the Insuring Agreement covers losses:

resulting directly from the Insured having, in good faith, for its own account or for the account of others,

(1) acquired, sold or delivered, or given value, extended credit or assumed liability, on the faith of, any original . . .

(a) Certificated security; . .

According to F&D, the claim for coverage is time barred because Integra discovered this loss by September 2007, when Martin Zorn learned from Pearlman's indictment that Pearlman had used forged documents to secure loans. The FDIC asserts that while Zorn knew that Pearlman had used some forged documents, the indictment did not list stock certificates as a type of forged document used by Pearlman in his bank fraud and Ponzi scheme. Thus, the FDIC alleges, Zorn did not know that the stock certificate was a forgery at that time. Rather, the FDIC argues, Integra discovered a bondable loss under Section E on March 18, 2008, when Integra's outside counsel discovered that a necessary signature on Pearlman's stock certificate was a forgery.

According to F&D, knowledge of a forgery constitutes discovery. In support, F&D relies on two cases – *Diebold Inc. v. Continental Cas. Co.* and *FDIC v. Cincinnati Ins. Cos.* In *Diebold*, the Third Circuit concluded that the bank's knowledge that money was disappearing in route to the ATMs was sufficient for discovery because "the 'disappearance' of money in the care and custody of an armored car company is a 'loss of a type covered by [the] bond.'" 430 Fed. Appx. 201, 207 (3d Cir. 2011). The plaintiff did not have to know that wrongdoing was involved in order to discover the claim. *Id.*

Here, Integra Bank knew that Pearlman had forged certain documents to obtain loans. However, unlike in *Diebold*, knowledge of forgery alone is not enough to constitute a loss of a type covered by the Bond. Rather, the forgery must be of a specific type of document in order to be covered by the Bond. Thus, *Diebold* is inapplicable here.

F&D also relies on *FDIC v. Cincinnati Ins. Cos.* for the proposition that knowledge of a forgery constitutes discovery of a bondable loss. Again, F&D's reliance is mistaken. In that case, the FDIC argued that it had discovered the loss when it learned that five tracts were purchased rather than one. 981 F. Supp. 2d 1324, 1340 (N.D. Ga. 2013). The court agreed that knowledge constituted discovery and found that this occurred when the bank learned that Grant made purchases substantially different from the purchase described in the sales contract and the loan terms. *Id.* at 1342. Thus, the court in *Cincinnati* did not find that the discovery of any forgery constituted discovery, but that the learning of the underlying facts did. Here, the court cannot find sufficient evidence to conclude that, as a matter of law, a reasonable person would believe a bondable loss had occurred prior to the discovery of the forged stock certificate. Thus, the court finds an issue of material fact on this issue, and cannot grant summary judgment on this claim.

## 2. Section A

Section A of the Bond covers losses resulting from fraudulent or dishonest acts by an employee. If the loss results from loans, then the bank must prove collusion by the employee. F&D maintains that the facts the FDIC proffers to prove collusion also prove that Integra Bank discovered the loss prior to February 18, 2008. According to F&D, the

10

following evidence shows that Integra Bank discovered its Coverage A claim more than two years before the filing of this lawsuit: (1) in November 2000, Mike Vea allegedly learned that Harrington dishonestly failed to report the total exposure on the Pearlman loans, (2) in an October 2006 interoffice memorandum, an Integra board member questioned the adequacy of Integra's collateral for certain Pearlman loans, and (3) in December 2007, Integra learned of Pearlman payments to Harrington after Harrington had left Integra and was working as Pearlman's loan broker. The court will discuss each in turn.

First, regarding Mike Vea's knowledge in 2000, he testified that "[he] felt [Harrington] didn't properly present the total exposure" of the Pearlman loans. Contrary to F&D's contention, Vea did not indicate that this was done dishonestly. The court cannot conclude that this knowledge was sufficient to constitute discovery of dishonesty or collusion by Harrington. A reasonable juror could conclude this was merely negligence on the part of Harrington.

Next, F&D points to an Interoffice Memorandum issued in October 2006, which questioned the collateral the bank had in the Pearlman loans. In reading this memorandum, it is clear to the court that Integra had not discovered employee dishonesty but rather negligence on the part of its attorneys. Negligence is not equal to dishonesty, thus this memorandum fails to show that Integra had discovered Harrington's dishonesty. Additionally, the memorandum shows that Integra Bank's leaders still had faith in the financial strength of Transcontinental. Therefore, this memorandum does not prove discovery.

Finally, F&D notes that Integra learned, on December 19, 2007, that Harrington received payments from Pearlman. The payments were dated from February 2005 to December 2006. During that time, Harrington worked as a loan broker for Pearlman. The FDIC asserts that a reasonable person would have found these to be payments for his later loan-broker services, not evidence of collusion while Harrington was employed at Integra Bank four years prior. The court agrees that a reasonable juror could reach that conclusion; therefore, this is also insufficient to prove discovery. Even considering these three items together, a reasonable person may conclude that Harrington performed poorly in his job and upon termination started to work for Pearlman. Thus, an issue of material fact exists regarding when discovery occurred under Section A.

### B. Is there coverage under Insuring Agreement A?

F&D argues that the court should grant summary judgment to it, because the FDIC cannot show that Harrington colluded with Pearlman as required by Insuring Agreement A. The FDIC alleges that Harrington's actions entitle it to coverage under Insuring Agreement A. That agreement provides, in pertinent part, that:

> If some or all of the Insured's loss results directly or indirectly from loans or trading, that portion of the loss is not covered unless the Insured shall first establish that
> (a) the loss was directly caused by fraudulent or dishonest acts of an employee, and
> (b) the fraudulent or dishonest acts were committed by the employee with the intent to cause the Insured to sustain such loss, and
> (c) the employee intended to receive or did in fact receive a financial benefit, and
> (d) if any of the loss results from loans, the employee was in collusion with one or more parties to the transactions.

To show collusion, the FDIC relies on the following facts: (1) Harrington received payments from Pearlman or his companies while employed at Integra, (2) after leaving his employment at Integra, Harrington worked for Pearlman and received substantial payments for securing loans, (3) Pearlman said that he and Harrington had a "wink wink" understanding, and (4) Harrington asserted his Fifth Amendment right against self-incrimination when questioned under oath about his involvement. To show that there was no agreement, F&D relies on the testimony of Pearlman and his associates.

According to F&D, the FDIC's claim of collusion relies solely on speculation and self-serving statements. F&D relies on several cases to show that speculation and self-serving statements do not constitute evidence that would foreclose the possibility of summary judgment. One of those cases is *Knowledge AZ, Inc. v. Jim Walters Resources, Inc.*, 617 F. Supp. 2d 774, 794 (S.D. Ind. 2008). In that case, the court granted summary judgment because there was no evidence of collusion. Specifically, the court disregarded an affidavit submitted by the plaintiff because it was based upon hearsay and contained an unsupported and conclusory statement that the defendant colluded. The court found that the affiant's speculation was not enough to create a genuine issue of material fact and granted summary judgment.

The court finds the present case to be distinguishable. The FDIC offers several forms of proof to show collusion.[1] The evidence offered by the FDIC is not merely

---

[1] F&D asserts that Harrington's invocation of the Fifth Amendment cannot be used to create a question of fact. This proposition is too broad. Seventh Circuit precedent states that the court or jury may take an adverse inference in a civil proceeding, but the failure to testify alone is not enough to prove guilt. *See LaSalle Bank Lake View v. Seguban*, 54 F.3d 387, 391-92 (7th Cir.

13

conclusory or self-serving; rather, it is circumstantial evidence from which a reasonable juror could infer that Harrington colluded with Pearlman.  A reasonable person could conclude from the facts shown by the FDIC that an agreement took place between Harrington and Pearlman.  The FDIC is not required to have a witness to this agreement.  As such, the court finds that a material issue of fact exists as to whether Harrington colluded with Pearlman, and thus, whether there is coverage under Insuring Agreement A.

### C. Is there coverage under Insuring Agreement E?

The FDIC also alleges that it is entitled to coverage under Insuring Agreement E, which states, in pertinent part, that:

> Loss resulting directly from the Insured having, in good faith, for its own account or for the account of others,
>
> (1) acquired, sold or delivered, or given value, extended credit or assumed liability, on the faith of, any original . . .
>
>    (a)    Certificated security; . . .

According to the FDIC, because the stock certificate given to Integra by Pearlman in September 2004 contained a forgery of Harry Milner's name, it caused them a loss covered by this provision.  F&D, on the other hand, argues that Integra did not suffer a loss resulting directly from the extension of credit on faith of a forged document.  According to F&D "by adopting the 'resulting directly' standard, the Bond draws a

---

1995).  "Silence is a relevant factor to be considered in light of the proffered evidence, but the direct inference of guilt from silence is forbidden." *Id.*  Thus, the court can consider Harrington's silence in light of the other evidence presented.

distinction between the risk of authentication (forgery and counterfeiting) against which the Bank could reasonably protect itself and the credit risk posed by worthless collateral." The policy allegedly covers counterfeit and forged documents, but not worthless collateral, because the loss would not be from the forgery but rather from the worthlessness of the stock.

As the Seventh Circuit has noted, the first step in interpreting the bond at issue is to determine which version the policy in question adopts and then look to cases interpreting that version. Insuring Agreement E provides coverage for "loss resulting directly from" forgery. This language in the bond "was adopted in response to the erroneous application of tort concepts of causation by some courts to earlier versions of the bond." *Beach Cmty. Bank v. St. Paul Mercury Ins. Co.*, 635 F.3d 1190, 1195 (11th Cir. 2011) (citing *First State Bank of Monticello v. Ohio Cas. Ins. Co.*, 555 F.3d 564, 568 (7th Cir. 2009). Thus, "tort-causation concepts like proximate cause, 'substantial factor' causation, and intervening cause are inappropriate" when interpreting a financial institution bond. *First State Bank of Monticello*, 555 F.3d at 570.

F&D cites to several cases interpreting this provision. The FDIC, on the other hand cites to a Seventh Circuit case citing a similar provision, and a case from the Northern District of Illinois[2] interpreting the exact provision. The cases cited by F&D state that a

---

[2] The Northern District of Illinois looked at the cases before it on this issue and determined that "losses resulting from forged documents that merely *describe or value collateral* do not fall within the ambit of Agreement E, whereas losses from forged documents that *are themselves* collateral are covered by Agreement E." *F.D.I.C. v. RLI Ins.*, No. 12 C 3790, 2014 WL 2598736, * 9 (N.D. Ill. June 10, 2014). Before this court are cases that ignore this distinction. Thus, the court does not find this to be particularly persuasive. On the other hand, *RLI Ins.* also

loss did not result directly from a forgery if the loss would have occurred in the absence of a forgery. *See Diebold Inc. v. Continental Cas. Co.*, 430 Fed. Appx. 201, 207 (3d Cir. 2011); *see also FDIC v. Cincinnati Ins. Co.*, 981 F. Supp. 2d 1324 (N.D. Ga. 2013).

The court has found no binding precedent interpreting the provision at issue. The FDIC asserts that *First Nat. Bank of Manitowoc v. Cincinnati Ins. Co.* is binding; however, the bond in that case covered "loss by reason of the Insured." 485 F.3d 971, 977 (7th Cir. 2007). Nevertheless, it is certainly persuasive as it criticizes cases such as those relied upon by F&D. Specifically, the Seventh Circuit found that the conclusion advocated by F&D "ignores the practical reality of the situation; but for the forged documents purporting to verify the existence of the collateral, credit would not have been extended in the first place, and there would have been no loss." *Id.* at 980.

The Eleventh Circuit also takes a more practical approach in interpreting the meaning of "loss resulting directly from" and looks at the worth of the collateral when it was given. The Eleventh Circuit concluded that "bonds [that] provide for losses that 'result[ ] directly from' fraud or dishonesty by employees [are] unaffected by events that follow the fraudulent act, such as an economic downturn, bankruptcy, or death of the debtor, that would have limited recovery by the insured." *Beach Cmty. Bank*, 635 F.3d at 1196. Thus, the pertinent question in the Eleventh Circuit is whether the collateral had value when it was given. If the collateral, had it not been a forgery, had value at that time, then "a loss is directly caused by the dishonest or fraudulent act within the meaning

---

noted there is considerable doubt that the worthless collateral doctrine would be good law in the Seventh Circuit. *Id.* at 10.

16

of the Bond where the bank can demonstrate that it would not have made the loan in the absence of the fraud." *Id.* at 1196. Therefore, like the Seventh Circuit's dicta rejecting F&D's argument, the Eleventh Circuit looks to the bank's reliance on such collateral.

In light of the doubt surrounding the applicability of the worthless collateral doctrine in the Seventh Circuit, the court will follow the Eleventh Circuit's interpretation. In reviewing the record, the court finds that whether the stock certificate collateral was worthless at the time it was pledged is an issue of material fact for two reasons. First, Pearlman has provided conflicting accounts on the issue. Pearlman testified in his deposition that TCA may have owned an airplane during at least part of the bank fraud scheme.[3] On the other hand, his plea agreement contained the following statement, which Pearlman represented as true: "TCA had no revenues, no airplanes, no employees, and no contracts with airlines." The court cannot make a credibility determination as to which statement is true; rather, such a determination is for the jury  Second, although there were no assets of significance, according to the Receiver, the bankruptcy trustee received over $200,000 from the auction proceeds of TCA's assets. Therefore, the court finds that there are facts in which a reasonable jury could conclude that, although TCA was a sham, the stock certificate was not in fact worthless.[4] The court also notes that a

---

[3] F&D asserts that this testimony is inadmissible because the argument is based upon Rule 2004 examinations. The court disagrees. Pearlman testified in his deposition in this case that either Trans Continental Leasing or Trans Continental Airlines had some aircraft. (Plaintiff's Exhibit 9, Pearlman Dep. 24:3-9). That testimony is clearly admissible as F&D had the opportunity to examine Pearlman regarding that statement.

[4] The court notes that the courts in Minnesota concluded, as a matter of law, the forged stock certificates used by Pearlman were worthless. *See Alerus Fin. Nat'l Ass'n v. St. Paul Mercury Ins. Co.*, No. A11 680, 2012 WL 254484 (Minn. Ct. App. Jan. 30, 2012). The Minnesota court,

material issue of fact exists surrounding whether or not Integra Bank relied on the forged certificate in issuing the loan.

## IV. Conclusion

In conclusion, the court finds that there are issues of material fact pertaining to whether Harrington colluded with Pearlman in the bank fraud scheme and also whether the TCA stock certificate given as collateral was worthless. Additionally, the court finds material issues of fact regarding whether a reasonable person had "discovered" the losses more than two years prior to the initiation of the tolling agreement. Therefore, F&D's motion for summary judgment (Filing No. 315) is **DENIED**.

**SO ORDERED** this 2nd day of December 2014.

_____
RICHARD L. YOUNG, CHIEF JUDGE
United States District Court
Southern District of Indiana

Distributed Electronically to Registered Counsel of Record.

---

however, did not appear to have the same testimony as offered in this case showing the issue of material fact.